Members 25-2162 and 25-2357, Mahmoud Khalil against President of the United States. Mr. Anson. Good morning. May it please the court, Drew Ensign, Deputy Assistant Attorney General for the United States. I'd like to reserve four minutes for a rebuttal. Granted. Five short years ago in the Tanzu case, this court explained that, quote, in law as in life, the path often matters as much as the destination. For an alien challenging his removal, that path begins with a petition for review of its removal order, not a habeas petition, end quote. But habeas is the path the petitioner has chosen, and the district court indulged that unlawful detour by issuing an indefensible injunction. This court should reverse. The district court's exercise of habeas jurisdiction was fundamentally flawed for two overarching reasons. First, the District of New Jersey lacked habeas jurisdiction because petitioner's custodian did not reside in that district and never has for even a single second in which petitioner's petition was pending in that court. All right. Well, let's start there. You agree, I take it, that at the time the habeas petition was filed in New York, that the government website indicated that Mr. Khalil was present in New York? That's what's been represented and we don't have evidence to contradict that. Okay. So any rational lawyer would have filed in New York because the government website said he was in New York. So that was sort of a proper move. I understand you don't think habeas was proper at all, but we're talking now about the location of habeas, right? You know, Your Honor, I think built into the premise of that question is the assumption that that database is updated in real time and has real-time GPS data of everyone, including on weekends when this was. I don't know that. Right. So, right, the website might have been wrong, but that's not Khalil's counsel's fault that the website was wrong. I agree with that, Your Honor. Okay. So had the website been current, it stands to reason that that petition would have been filed in New Jersey because at the time the petition was filed, Mr. Khalil was in New Jersey, correct? That's correct, Your Honor. Okay. So they could have filed in New Jersey had they known he was in New Jersey. They would have filed in New Jersey had they known he was in New Jersey. And then he gets transferred to Louisiana, correct? That's correct as to the chronology, Your Honor. Okay. So why under ENDO doesn't jurisdiction lie, didn't jurisdiction lie in New Jersey? Because it can't be the law that when a habeas petition is filed in one proper location that when the petitioner is moved about the country, the jurisdiction just runs around the country wherever the petition is moved. That can't be the law, right? That isn't the law, but there are doctrines to address that. So I think it's helpful kind of to start with first principles, which is Congress in section 2241 made clear that venue for habeas petitions exists in a single location. It's a single venue and that is the only place that habeas is proper, and the Supreme Court reiterated that in Padilla. ENDO represents a very limited exception to that where a person is moved after a district court validly acquires jurisdiction from a properly filed petition, and Padilla says both of those things need to be true, that the district court needed to have acquired jurisdiction and it needed to be a properly filed petition. Well, it was a properly filed petition because they were told he was in New York at the time, so then the transfer is made. Padilla is different because Padilla was already at the brig time the petition was filed. So if the lawyer in Padilla had been following the law or could have anticipated what the court said in Padilla, then it was obvious that South Carolina was the place to file in Padilla, correct? That's correct. It's the Padilla case, and so the facts may have been a little different there, but the principle that the Supreme Court explicated is that the petition needs to be properly filed, and if it's filed in the wrong and also the district court, the district in New Jersey did not validly acquire jurisdiction. By the time that it was transferred to it, the custodian was no longer there, so it did not acquire jurisdiction, and this court in the Anariba case reiterated that principle that the district court needed to have acquired jurisdiction in order for the ENDO exception to apply. ENDO only applies where a district court has validly acquired jurisdiction, and the person has been moved, not where the movement has already occurred before the district petition is transferred to it. I think it's important to maintain that limitation because Congress did want it to be in a single location, and 2241 uses a definite article, and that is the only proper place subject to some very limited exceptions. The other potential exception that they pointed to is the unknown custodian exception, but that's one that Padilla makes clear is very limited. It only applies where, quote, it is impossible to apply, end quote, the ordinary rules of habeas. No court, you know, previously has recognized that something in a matter of mere hours makes it, particularly over a long week or over a weekend, would make it impossible to apply the rules, the ordinary rules. Where are we going to draw the line? Someone's incommunicado for a week, that's not enough? Your Honor, I think that's certainly closer to it. The point of the immediate custodian exception is to avoid a situation where something would evade judicial review. Okay, well, they're dealing with a situation where, you know, immigrants have been spirited out of the country in a matter of a day or two. Are they acting unreasonably? Is the system acting unreasonably in saying there needs to be somewhere where this can be brought before someone can be spirited out of the country? Your Honor, I don't think that that's what's presented here. I'm asking, should we adopt a rule that allows the executive to remove someone from the country in 24 to 48 hours and say, there's no jurisdiction anywhere until the court's open on Monday, by which time he's on a plane? No, I... We're not asking us to adopt that rule. We're not asking you to adopt that rule. The immediate custodian exception could theoretically apply in a circumstance where, you know, the point of the immediate custodian exception is to address situations where something would otherwise evade judicial review. Okay, and I'm saying, if our rule says, wait until the court, the system is updated Monday morning, the executive might spirit the person out of the country over the weekend. Are you asking us to adopt a rule that says, when there's a lag in the database, that's all on their lawyers, and then Monday morning, sayonara, sorry, he's gone? Your Honor, I think it certainly would present different facts if what the petitioner was saying is removal is eminent in a matter of hours and we don't know where they are. They didn't know. The lawyers didn't know. They had to prepare for the worst. They did their best. What else do they do unless we're creating a black hole of no jurisdiction? Your Honor, I don't think you're creating that, and even to the extent that the immediate custodian exception would apply, as the D.C. Circuit has made clear in the Demandjic case, once the location becomes known, that exception no longer has any application, and then jurisdiction needs to, you know, by Sunday, it was known, or midday Sunday, I believe, it was known that petitioner was in the Western District of Louisiana. A petition could be filed there. But the petition had already been filed. In the wrong court, Your Honor. Well, it was filed in the wrong court because the government website indicated that he was in New York. You haven't challenged any of the District Court's findings, have you? In what respect, Your Honor? I haven't seen any argument about clear error on any findings of fact that the District Court made. No, Your Honor, and in fact, the Southern District of New York found that this was done based on ordinary operational, you know... I'm talking more about the New Jersey District Court because the District Court there found that a counsel for the government persistently and repeatedly misrepresented where Mr. Khalil was. When he was in New Jersey and told his attorneys that, and his family, that he was in New York. So I think this is more than just the, you know, updating of the database. He was given misinformation, and his attorneys followed that information to file in New York. Your Honor, we do dispute that, although our legal arguments do not turn on those specific facts because the contours of the doctrine of the unknown custodian wouldn't even apply in those circumstances. Put note one in our brief explains, you know, when information was given to Mr. Khalil and his lawyers at various opportunities. That information was provided in, you know, roughly around... But in the scenario where the District Court has found that Mr. Khalil's counsel was told he was in New York, the attorneys looked for the opportunity to file a habeas petition, which I think you would agree that habeas is available at any time for someone who is detained in this country, wouldn't you? As a general rule. As a general rule, yes, Your Honor. Sure. And so they were told that he was in New York, and they filed in New York. And so I think what you're saying is they should have waited a couple days to find out that he was in Louisiana and filed then? It wasn't a couple days. And to the extent that they're alternatively trying to avail themselves of the unknown custodian exception, that exception ceased to apply once his location became known. And so once it became known that he was in the Western District of Louisiana, they needed to file there. They were filing in the first instance, sure, right? But they had already filed. I mean, there's good reason why we don't make habeas petitions be transferred around the country, because prisoners detainees are regularly moved from district to district. Your Honor, the endo exception does apply to address those circumstances. But again, both Padilla, the Supreme Court in Padilla, and this court in the Ann Arriba case, have made clear that that district court needed to acquire jurisdiction in order to retain it under the endo exception. And the District of New Jersey did not acquire jurisdiction because the petition was never pending in that court for even a single minute in which petitioner was also being held in custody in that court. But doesn't that depend on the validity of the transfer from New York to New Jersey? If that transfer were valid, then jurisdiction lied in New Jersey. Your Honor, do you argue that it was an invalid transfer? Sorry, transfer of the case, I apologize. Oh, yeah. From the New York court to the New Jersey court. We do believe that transfer was invalid. Why? Because it violates the Supreme Court's immediate custodian rule. 2241 has strict limits on where venue can be had for habeas petitions, and that transfer order violated where Congress has allocated that that venue must be. His immediate custodian was in the Western District of Louisiana when that transfer order was made, and it transferred it, therefore, in contravention of what Congress provided in 2241. Okay. All right. If I may, there's a second set of jurisdictional bars that might make this even easier. Go ahead. Go through those quickly if you could, because we have a lot of questions about the INA. I was just going to say, multiple provisions of the INA here bar jurisdiction. To begin with, section 1252G bar petitioner's claim because he challenges commencement and adjudication of removal proceedings. I think this court's decision in Tazu is quite clear on this. Sections A5 and B9 separately bar petitioner's claims because they, quote, arise from any action taken or proceeding brought to remove an alien from the United States, end quote. Indeed, this court previously held that void for vagueness challenges specifically to the foreign policy admissibility bar needed to be channeled to the course of appeals through petitions for review, even before Congress substantially tightened the section 1252 bars through IHRA, and that was in the Masu case, which was authored by then Judge Alito. Okay. Now, the problem with 1252G for you is that Tazu made clear it was only about three discrete things, and the Supreme Court likewise said this. You know, it's about commencing proceedings, adjudicating cases, or executing removal orders. Detention is not one of those three things. Your Honor, we think it can be. Under the Tazu case, Tazu said a brief door-to-plane detention once the person's been ordered removed, implying that this is not just about all detentions. It's about the detention that's bound up with executing the removal order. But this is the detention bound up and holding petitioner pending the removal proceedings. Pending the removal proceedings, not about executing the removal order. But you could easily go ahead and commence the proceedings and adjudicate the cases without detaining him. Well, several reactions to that, Your Honor. First of all, whenever proceedings are commenced, there's a binary choice whether or not to detain someone. Either detained or not, the binary choice is inexplicably bound up with the commencement decision itself. And indeed, what the 11th Circuit said is, quote, securing an alien while awaiting his removal hearing constitutes an action taken to commence proceedings, end quote. And that's in the Alvarez versus Ice case. I understand, but Tazu, which is Third Circuit President, which happened to Walther, didn't read it that broadly. Second, Your Honor, I think the posture here makes it clear that it's inexplicably bound up with that because petitioner's constitutional claims, challenging removal and challenging detention, are identical. They are the very same claims advancing the very same theories. And the petitioner himself has therefore tightly combined these two into a single package for adjudication. He cannot reach his claims challenging detention without also reaching his claims challenging removal. He's made that certain. But even if Your Honor didn't think that – so 1252G certainly covers removal itself. To the extent that you didn't think it covered detention as well, I think Sections A5 and B9 have a lot of work here to do as well. The Supreme Court in the Jennings case said explicitly that Section B9 reaches, quote, the decision to detain the alien in the first place or to seek removal. And so because that arises from removal proceedings, Subsection B9 is probably the most obvious place to have the jurisdiction. So help me here. You've got the B9 argument, but your first hurdle is that the Third Circuit interpreted it in chahaze. Does chahaze as applying only after the final order removal, does that part of chahaze survive Jennings? I don't believe so, and I think this court recognizes much already in the EOHC case. There, this court recognized that the bar would apply notwithstanding the absence of the final order of removal. And what this court said is most claims that even relate to removal, end quote, are improper if brought to the district court. And I think that Jennings also reads Subsection B9 in a way that is simply no longer compatible with this court's prior precedents. And I think EOHC has already crossed that bridge. That has to be a real over-reading of EOHC because it would include claims of prolonged detention before getting a hearing, right, which I would think you would agree on our precedent. It can be reviewed in a habeas petition. Certainly EOHC makes clear that conditions of confinement and length of confinement are outside of the B9 bars or outside of the B9. So the fact of the confinement is related to removal proceedings. So EOHC can't say that really nothing related to removal proceedings can be challenged. Your Honor, I think the analysis that goes, I will acknowledge that the particular facts of that case don't shed a lot of light here. But the analysis that it used is where it read B9 in a way that does not require a final order of removal to be effective. And that's the only way to reconcile its analysis. And it was following what Jennings said as well, which recognizes that there need not be a final order of removal. Well, what about the now or never part of EOHC? And as you mentioned, the facts are not particularly analogous, but we're talking about First Amendment claims. And First Amendment injuries are in many cases when they are not able to be remedied after a final judgment in a traditional case. So why isn't this a now or never claim with regard to the detention? Your Honor, I think it's distinct. So the claims that this court recognized in EOHC are the sort of conditions of confinement or length of detention, which have nothing to do with the underlying removal itself. Here, it's not a now or never challenge because petitioner's constitutional claims challenging both removal and detention are identical. So he will receive judicial review of those claims because removal will be reviewed by the Court of Appeals. But by the time he gets that review, he will have, if detained, his First Amendment rights will have been suppressed for some number of months. So why isn't that a now or never issue? Your Honor, because it can't be reached by a Court of Appeals through the procedures that Congress has challenged. The damage is happening. Let me give you a hypothetical to follow up on Judge Freeman's question. Let's assume 100 people who are removable from the country. And the government's position is that none of them should be detained based on their particular fact patterns, okay? But one of the 100 is publishing things that the government doesn't like. So the government detains that case into custody, that one out of the 100. Are you arguing that that person's First Amendment challenge saying, look, the only reason they detain me, they don't detain people like me. The only reason they detained me is because of the exercise of my First Amendment rights while I was a legal permanent resident. Is it your position that there's no First Amendment harm because a year and a half later, the Court of Appeals will get a petition for review? I guess a couple different reactions to that, Your Honor. First of all, that would not be a viable First Amendment claim under the Supreme Court's decision in Reno v. AADC. There, the Clinton administration fully admitted that the plaintiff's speech and associations were the reasons that they were initiating removal proceedings. And the Supreme Court said, your argument under the First Amendment that that selective prosecution is not viable under the First Amendment and can't be made. Well, I'm not suggesting the person can't be removed in my hypothetical. That's what I think the selective prosecution case law addresses. What I'm addressing is strictly detention, which is the heart of habeas, right? Habeas is all about detention, right? And a little bit more according to JGG. But I'm just focused on detention right now. Is it your argument that that person can't bring a First Amendment claim because at some much later date, they can be heard on that First Amendment challenge? Yes, Your Honor. So I think there's both the merits and the jurisdictional components, though. So it's the merits. Reno v. AADC makes clear that that principle absolutely applies for removal. And there's no suggestion, I think, that a different principle would apply to detention pending removal, particularly where that detention is bound up with the removal itself. As to how that could be or how that could be heard, notably, there are administrative remedies here that the petitioner has not really availed himself of. You can seek bail, for example, before an IJ. You can even raise constitutional claims before the IJ. Petitioner initially elected to do that and ultimately abandoned it, concluding that the path that Congress had given him was not one he wanted to follow. Let's talk a little about bail. I mean, we have a bunch of findings from this district judge that this Khalil does not pose a risk of flight. He's not a danger to the community. Shouldn't that ultimately be dispositive? You know, you didn't oppose that, you know, that. I don't believe so, Your Honor, and I think it has a fundamental defect. Certainly, flight risk could be a valid component of the bail analysis, but in order to have that sort of interim, you know, equitable relief, he needed to show a likelihood of success. Bail is not equitable, by the way. The way the district court entered the preliminary injunction, that was equitable, but bail itself is a legal remedy that doesn't depend on likelihood of success on the merits. Well, this court in Londano said that it did. It read the test as being a conjunctive test that required both likely success on the merits as well as extraordinary circumstances. All right, let's talk about Professor Kellen Funk's brief, which suggested, if anything, the district court applied too stringent a bail standard, and that historically for people who haven't been adjudicated guilty or anything, the standard should be just, you know, reasonably required to assure the person's appearance. Well, Your Honor, certainly those are more typically criminal concepts. Okay, but he's not charged with the crime here. It suggests that he should have a lesser standard rather than a greater one. Well, Your Honor, certainly bail is available before the IJ, and so all of this is being conducted in an improper form as an initial matter, and so I think that, you know, that should be a full stop. I think, you know, this court's decision in Londano also suggests that likelihood of success is, you know, an important part of the analysis, in fact, the necessary components of it. And so between that and this does seem like interim relief to us, and I think Londano and Lucas are both post-conviction habeas cases after conviction, the liberty interest is less. The chance you're going to get your conviction overturned. Your Honor, we're already pretty deep into the criminal context, which I don't think there are apples to apples comparisons, and, you know, I think that the principle that Londano recognizes is an important one, that the idea that you could get a release order where a district court thought there was only a one percent chance that you would ultimately succeed on the merits, you know, strikes us as very odd, and I think, you know, even if you think Winter isn't directly controlling, it is the sort of informs the correct analysis. What the district court here, I mean, Lucas as well recognizes this as an extraordinary remedy, much as injunctive relief is an extraordinary remedy. The idea that that would issue in a completely merit-agnostic way is something that is just, it seems like a very foreign concept, and it seems like this court in Londano thought, you know, that that needed to be in a component of the analysis, and we think the district court abuses discretion and committed legal error by not analyzing that component. Thank you. We'll hear you back on rebuttal, Mr. Ensign. Thank you, Your Honors. Mr. Kaufman. Thank you, Your Honor. I'll be addressing the jurisdictional questions, and my colleague, Mr. Hodgson, will address the preliminary injunction and the merits of the bail order. The core of this case has been undisputed for six months. People in our government didn't like the protected pro-Palestine speech of a lawful permanent resident, so they detained him, sent him far away to Louisiana, and began efforts to remove him from the country while proudly warning others that they might be next. Across the law, First Amendment injuries are seen as special, and the nature of the extraordinary harms from ongoing government censorship in this case means that finding jurisdiction here would be consistent with the INA. Immediate habeas review is necessary not only because the freedoms the First Amendment protects are so foundational to our democracy and to the remainder of our rights, but because every day of delay simply furthers the unlawful retaliatory ends that Mr. Khalil is asking the court to stop. The district court properly understood this in finding jurisdiction and granting preliminary relief, and this court should affirm the injunction as well as the bail order. What's your response to the government's argument that the judge in New York knew that your client was in Louisiana, so why wasn't the petition transferred to Louisiana? Well, I think the question before the New York court was where the petition should be transferred, and 1631, which the government has not addressed the text of that statute at all in this entire litigation, makes very clear that that can go to, if the Padilla rules apply, it can go to the district of confinement, and that's where the district of confinement was, and any other rule would get right. It wasn't the district of confinement at the time of the transfer. It was the district of confinement at the time the petition was filed in New York. That's right, that's right, but that's exactly why. Help us figure out why it's better to say that the transfer should occur to the place where I think every reasonable person would agree it could have and should have been filed in New Jersey. Obviously, you would have filed in New Jersey had you known he was in New Jersey, but why is it better for us to create a rule that the transfer should occur to the place where the filing could have happened rather than the jurisdiction where everyone knows the petitioner to be located? Well, I think we're not asking you to create that rule. Congress created that rule. It wrote the statute to say that you can transfer if finding in the interest of justice, which the district court did. It actually requires transfer to the place that it could have been brought, which is New Jersey. That's the district of confinement, and no one argues that had the petition been brought in New Jersey at the same time, there wouldn't have been habeas jurisdiction there. Of course, there would have been, and the statute is also clear that the petition after transfer is treated as if it was filed at the original time, and that takes care of all these kinds of concerns. The government's effort to transfer this case to Louisiana is completely atextual. There's no basis for the idea that at that moment there could have even been a filing in Louisiana when he was confined to New Jersey. I don't even understand- There has to be a new filing. I think that's it. The government has sort of gone back and forth throughout this litigation of whether petitions should be dismissed, whether it be transferred. In the Southern District of New York, which is the transfer we're talking about, the government said, you can dismiss or transfer maybe to New Jersey, and maybe we'll contest it there, maybe to Louisiana. It never provided a basis for the Louisiana transfer at all. And I think sort of that tactic of sort of complaining about jurisdiction wherever you move to is exactly what the court in ISIL was talking about when it said that that can become a tough-ass experience where the government is chasing you around to different jurisdictions and telling you you don't have habeas jurisdiction. So I just think that's not at all on the table. I think the government's arguments on habeas are weak and dangerous. They don't engage with the text of the statute. They don't engage with the text of 2242, which explicitly says that if your custodian is not known, it does not need to be named in the petition at all. And so there's an argument that the petition, even without naming the custodian at all, was properly filed. So I really think the government's overreading a lot. It overreads the language in Padilla about ENDO only applying if there's a proper filing. I think Section 1631 very clearly makes clear that that is treated as if it was filed. That's the entire point of 1631. Let's talk about the scope of habeas. You'd agree that habeas fundamentally is about detention, correct? The core of habeas is always understood to be detention. Okay. And JGG seems to expand that a little bit. What's your view about how far JGG expands that? Well, I think there's a little debate about JGG. I think you could read it to say that it covers removal claims that are inevitably followed from detention claims. But I think the important point for us is that either JGG controls and there is habeas jurisdiction over all the relief that was granted here, or we have 1331. Well, there's a middle ground, right? It's impossible that there's habeas jurisdiction over some of it, but not everything. I mean, the June 11th order was quite different from the July 17th order, and you seem to sort of quickly elide the notion that, while I appreciate your agreement that habeas is fundamentally about detention, you sort of quickly then said, well, it's about removal too. And that's a large leap, right? How do you get from detention to removal? And what precedent do you have to support that? Well, I think the starting point would be the court in St. Cyr talking about how there's always been habeas review over some aspects of removal. And so I think that shows with JGG that there is the ability of federal courts to review some elements of removal and habeas, especially as JGG suggests. But St. Cyr preceded the statute at issue though. Isn't that a problem? Are we talking about the INA now? Yeah. Well, I don't think so. And again, I don't think it's... The INA, it was an overhaul. Isn't it fair to say that this was a complete overhaul by Congress? This airlifted all these cases from the district courts, and it set up a fairly reticulated scheme that said the way it's going to go henceforth is you're going to go in front of an immigration judge. And if you don't like what the immigration judge does, then you go to the Board of Immigration Appeals. If you don't like that, you go to the Circuit Court of Appeals and then in the Supreme Court. That's the scheme that Congress set up, correct? Yeah, that's true, Your Honor. But I think that that is sort of taking the INA bars question into the relief question. And I don't think that's really necessary because, again, we have 1331. And another way to explain what happened in those later orders, the court issued an injunction against detention and removal. And then the rest of it, it was enforcing that PI. So there was an effort in his equitable authority to sort of enforce his own orders to add more to it because the government essentially ignored the preliminary injunction from the start. But I do think that regardless of whether there's habeas jurisdiction over that kind of relief, there would be 1331 jurisdiction if the INA 1252b9, I mean, it says consolidation of questions for judicial review. The Supreme Court has referred to it as a zipper clause. And the logic of the OHC is you get one chance to remove things. So if there's a claim you're not going to be able to review at the end, we'll review it now. Conditions of confinement, medical treatment, maybe length of detention. But I thought the strongest point the government made was the constitutional challenges made here, challenging detention, are identical to the ones being made for removal. So if, I know you're contesting whether the removal challenges have to be hived off and go to Louisiana, but if they do, doesn't that mean that likewise the detention challenges, you'll get a chance to review them there, the underlying claim, isn't that what you get one shot at versus your theory is it's the, hey, there's a harm we're suffering now. Why should we read 1252b9 and EOHC your way rather than the government's way? Well, first, I think as it relates to detention, and I think this court was clear in EOHC, but the entire arising from interpretation from Jennings is about relief. And Jennings is very clear. Detention claims just simply do not fit into that concept. I think there's language in EOHC that cuts both ways. The introduction says ordinarily you've got to wait, but then there's a special situation when you won't be able to review the claim later. Now, there are other places in EOHC that talk about the harm you're suffering in the meantime. But this case is on a fault line or a knife edge of an issue that EOHC didn't have to confront because both the claim and the harm would be unremediable later. Now, the government stresses, hey, you will get a fair shot at this void for vagueness claim down there. If it's right that that claim and challenge to removal has to wait, why shouldn't the challenge to detention likewise? You'll get that legal issue resolved then. Why not wait because the B9 says consolidation of questions for judicial review? Well, I think neither of them has to wait for different reasons, but similar reasons. The detention claim doesn't have to wait because as Judge Freeman was explaining earlier, you can't remediate detention pending an adjudication if it's unlawful at the end of that proceeding. And that follows from EOHC, from Jennings, and from multiple Supreme Court cases after that. So I think detention clearly cannot be remedied. But what's unique here in this case is the harms that are flowing from this unique provision and the application by the state. And that brings this case much closer to EOHC and the now or never analysis and firmly within it, actually, because these are harms that also cannot be addressed at the end of the process of a PFR. And the EOHC opinion is very illustrative in coming up with examples of kinds of claims that would work. So one was if your claim is that you're being deprived of kosher food. Well, here, Mr. Khalil is being deprived of speech. And that is a paramount concern under the Constitution, where across the law, we do not make people wait and suffer for serious First Amendment issues. But the difference in that case was that a claim of deprivation of kosher food or in that situation of the harms of being in Mexico, not the country they're going to be removed to, is not something that the claim won't get reviewed. And I don't know. I mean, I know that the title of the statute isn't dispositive, but it's worth something that the heading of the section says consolidation of questions for judicial review. And this is, you would agree, this is the same question that underlies the challenge to removal. I think they're slightly different. I'll defer a little bit to my colleague here to talk about why. But even under the retaliation analysis under Mount Healthy, the adverse action is different in each. One is detention and one is the threat of removal. And so that might seem like a small distinction. It's the same legal doctrine, but you're saying slightly different operative facts in challenging under the same doctrine. I think so. The other point to make is that we have an independent substitute due process punitive detention claim challenging the detention. And that's totally different. That's totally different than the retaliation claims. And it would have nothing to do with later review. It wouldn't be a punitive removal claim under due process. It is a punitive removal. No, there is no punitive removal claim under due process. There's a punitive detention claim. And there is a First Amendment retaliation claim against the detention and a First Amendment retaliation claim against the removal as well. I see my time is up. How can you make the retaliatory removal claim under the First Amendment? Well, I think selective prosecution and retaliation are very different. And I think sort of looking back, we haven't talked about G at all, but I think one of our arguments on G is about how it can't bar a challenge to the AG's very authority to engage in a behavior. And so I think you can line up these cases pretty neatly and take care of selective prosecution. So cases like ours are like Garcia, right? The limitation period had expired to rescind the adjustment of status. So challenging that is not challenging commencement of proceedings. Madu, there was no order of removal at all. Same thing. Seventh case cited in Garcia, foreign elect. Same, similar kind of pattern. And I think the cases that line up on the other side are cases like Pazu. Even if or even though there are direct challenges to removal, even if even though you have authority to do what you're doing, I'm still coming after it. And I think selective enforcement cases like AADC and Radbeer are squarely in there. You know, selective enforcement is a defense, as Justice Scalia went on for pages talking about, how it is a defense to prosecutorial discretion or an act of prosecutorial discretion. And essentially says, relieve me of the consequences of this thing that I acknowledge the government could do. Retaliation is very different. And the structure of our claim is very different here, because we are attacking a decision by the Secretary of State to issue a termination. And even though that flowed to things that, you know, the Attorney General ended up doing, there was nothing that said the Attorney General has to actually remove or commence proceedings on the basis of the Rubio determination. And in fact, we sent a letter. Forget the Rubio determination. What about the fraud charge? The fraud charge isn't before the court, Your Honor. And one day it might be, but that's simply not part of this case. And excuse me, that might present different issues. It might not, depending on- You don't dispute that your client could just be picked up tomorrow and detained on the fraud charge. And that would obviate all of this about the harms from the void for vagueness of the Secretary's determination. Well, not thanks to the bail order. But, you know, and that is what the government essentially did when the detention based on the Rubio detention was enjoined. If the bail order protects him on the fraud charge, then the fraud charge is part of this case. It's part of the petition, but it is not a part of the matter before the court here on the injunction. And, you know, just to finish answering your question, that is essentially what happened. When the government was no longer allowed to detain Mr. Khalil on the basis of the Rubio determination, it kept him in detention and shifted its justification to the second charge. And that was part of the discussion during the hearing and part of the basis that the court found extraordinary circumstances in this case. If we send all- say that the INA bars jurisdiction over all this here and send it all through the PFR process, can you go ahead and litigate all your First Amendment and void for vagueness challenges and due process challenges down there? Is there any fact finding required? And if so, could that be done by a limited remand down there? Well, I think the district court made a lot of findings in this area about how limited the fact finding could be for the IJ. The IJ, you know, notably said, you're in the wrong court for that. I mean, tried to engage in discovery, but the IJ is also limited on this charge through BIA precedent. But the judge can't look past the All right. Well, I'm going to be asking your friend on rebuttal whether he'll agree that you should have an opportunity for a limited remand or any fact finding if the case goes down there. And also whether those will proceed, because it's an important question whether you'll get one shot at this claim or zero shots at this claim. And what- tell me what you think you need in terms of fact finding. Well, I think that, you know, there's a lot of facts found on the PI, which raises similar claims. And, you know, the point I really like to make, though, is that regardless of what happens, regardless of whether there's some sort of safety valve in the Hobbs Act to send it back down for more fact finding, go up to the Fifth Circuit, go down, what's happening here is urgent First Amendment harms and censorship. And so to force Mr. Khalil to go through that and bounce around- What if we got the government, if the government were willing to represent that they would move that along very expeditiously. I mean, I think it'd be a very different situation if they seemed to be keeping your client in limbo. I don't think that would be sufficient, Your Honor. And I, you know, looking to sort of similar cases in First Amendment area, you know, one I might point to, which I think is a good analogy, is the Skokie case. You know, that's a case famous for its result. But there the court took- the Supreme Court took jurisdiction under the collateral order doctrine over a denial of a stay from the state Supreme Court. And what the court said was, and in language that's resonant of the sort of benign considerations, is that that is collateral. And what it said is the reason that it's collateral is that it will deprive the plaintiffs of rights protected by the First Amendment during the period of appellate review. And it put that at around a year or more. I think that's a reasonable comparison to what might happen in this case. I just think it's not allowed under the First Amendment to simply make Mr. Khalil suffer those harms, certainly under detention for that entire time, but as to removal as well. And I think that that is something that the government can't really answer. There's no way for the Fifth Circuit to address those harms later on. Mr. Einstein said that you can litigate the constitutional claims before the IJ. Do you agree? No, not effectively. The IJ has no power to decide on submissions from the government. The IJ can't enjoin the review of determination in the way that we're seeking. It can't suppress information. It can't suppress the review of determination. And so the IJ has a limited scope of review, famously. The IJ is looking at whether someone's removable. And in this case, which I think the district court also explained why what's actually happening here is relevant, the IJ has said over and over that I can't look behind this, and I'm going to look behind this, and you can deal with it later. And that's just not tolerable in the First Amendment. And if this matter were to continue in the New Jersey district court and the order of removal were to become final and be followed by a petition for review to the Fifth Circuit, would you be litigating the same claims in the District of New Jersey or perhaps on appeal here and in the Fifth Circuit? There's a potential that that will happen, yeah. So how does that square with B-9, then? Is that what B-9 – Congress intended when it wrote B-9, that if there's an hour-and-hour never claim, maybe you can litigate it in habeas, and then you'll be doing two things on parallel tracks? I understand the tension. But what I would say about B-9 is Congress was thinking about the millions of cases that pass through the immigration system every year. It was not thinking about a to silence an individual for – an LPR for free speech and silence others on the basis of that. And I think it's just wrong to read – however – whatever sense you want to make of B-9 and what Congress was trying to do. I think it's wrong to read Congress as – especially with all the presumptions that apply, that should leave room for extreme cases, which was Justice Alito's and Jennings. There has to be room under B-9 for extreme cases. This is an extreme case. And so I think that it's just fair to say that this is exceptional in many ways and that if this claim goes through and there's some odd sort of consequences, that there might be potentially litigation in two places at once, and maybe the Supreme Court will have to resolve that. I think that that's just the price of the First Amendment. It's the price of the suspension clause. And that should not be a reason to retro – to read B-9 in a way that limits review here. It just seems to open a pinned door's box potentially because anybody then who was subject to a removal process could say or publish things that it would – the person or the person's lawyers would know to be of concern to the government or inflammatory or extreme or whatever. And you could basically concoct an opportunity for dual-track review like the dual-track review you were just discussing with Judge Freeman by – through one speech. That doesn't sound like a very prudent legal rule. I don't think that's a very serious concern for several reasons. If the claim is facially bad, that's not going to be something that's going to proceed very far. But the reality is this case is not that. The government has never denied that it was basing its decision on speech from the time that it – No, I understand this case is not that. What I'm suggesting is that if we accept what you just said a minute ago, that sends a clear message to the hundreds of thousands or perhaps millions of people in the removal process that here's what you need to do to get a free ticket or at least two bites at the app. I don't think that's right, Your Honor, because if somebody – Well, why wouldn't one? Wouldn't that be the advice you'd give to the next client that walked in your door? It seems logical that any prudent lawyer would say, look, here's what you do. If you want to – there's certain things you say or do to get a more lenient sentence in a criminal case. There's certain things you say or do to get more ample review in a removal case. Absolutely not, because once you're in removal detention – removal proceedings, the retaliation – your argument for retaliation has already passed you by. Mr. Khalil is being punished for things he said a year ago, before any of us knew him. And so there's no way to sort of manufacture a retaliation claim when you're already in removal proceedings. And this claim was filed hours after he was detained. And so this is an exceptional case. I do not – But a whole bunch of people in the future will be copycats. I mean, I think that's his fear. And more generally, I think the fear is if you say, okay, this issue is the same as the one on which removal is being contested, then every issue – everyone who has a challenge to removal will likewise raise the ground as a challenge to detention to get a second bite at the apple, whereas the Zipper Clause's point is you get one, but you get only one shot at review, and that's supposed to be through the PFR process. I don't think that's right. I think the identity of claims in that kind of situation would be quite different. And just to take the mandatory detention context, there is no constitutional right – sorry, there is the ability of the government to detain under the mandatory detention statute pending adjudication. And so you don't have a claim there that would sort of overlap in the same way it would here. But your claim will be, hey, they didn't have to take me into detention. They took me into detention. It's retaliatory. And by the way, the only basis you're reading of B9 is like, well, this is – the harm from the detention is something that's not remediable later. Therefore, I should get review of it now. It's a second bite at the apple. I think the harm from detention fitting into the B9 now or never category is pretty well established. And so if the idea is that we're going to not review detention claims just because they overlap, I think that's just the way Nathan talked about the Xenoster, it cannot be that because the government finds a way to find identity between its justification for removing you and for detaining you that you don't get review over your detention. I understand the awkwardness that that might cause in terms of, well, now what do we do with the removal piece of it? But again, I would point back to EOHC. If there is concern – if the reading of B9 is there's no way we can review anything related to removal, which I think is wrong. EOHC talks about how you look at the relief. The relief is the thing. And so here in this case, you could review the First Amendment detention claim and not review the First Amendment – and say the First Amendment retaliation claim as to removal needs to go to the PFR. Again, I don't think that needs to happen because of the urgent First Amendment harms. But if that were the case, that would be fine. MR GOLDSTEIN Would that collaterally stop or become the law of the case, such that the person would be able to leverage a favorable ruling here over there? MR O'BRIEN I think preclusion is a fact of life in litigation. MR GOLDSTEIN Okay, so basically you do get a benefit from litigating it. MR O'BRIEN Well, I don't think so. And if you just think about it practically, to benefit from preclusion, you need to get to a final decision there, right? There needs to be finality. And just look at the state of the two cases here. It's very unlikely one will become final before the other in a way that will actually lead to preclusion. Preclusion is a thing that happens in litigation. And it happens in immigration cases. There's a Ninth Circuit opinion from Justice Breyer talking about that, and how a district court had ordered a waiver hearing and found that preclusive against an IJ's determination that there would not be one. And so that's just part of the system. That's part of our litigation system. And it's not a reason to run away from a case like this which is so extraordinary and where the First Amendment harms absolutely need redress now. MR HOFFMAN All right. Thank you, Mr. Hoffman. We'll hear from Mr. Hodgson. Mr. Hoffman, I apologize. MR HOFFMAN Good morning, Your Honors. May it please the Court. Robert Hodgson from the New York Civil Liberties Union Foundation, also for the petitioner Mahmoud Khalil. So as my colleague mentioned, I'll be addressing the non-jurisdictional aspects of the appeal today, the merits of the preliminary injunction, irreparable harm, and the merits of the bail determination. MR HODGSON The district court didn't consider at all. It granted this P.I., but P.I. is equitable. It's only for when no legal relief is available. Bail is a legal remedy, so why did it have to go for the P.I. at all? MR HODGSON Well, I think the P.I. was to address specifically the harms that flowed from the foreign policy ground as applied to the Rubio determination. And there, the district court found, number one, that there were several irreparable harms that flowed directly from that determination that were separate and apart from detention and that were not at issue when the court later issued its bail determination, which was addressing a subsequent, and as the court noted, made factual findings that haven't been challenged, very, very, very unusual form of detention that flowed after the P.I. had been issued. So I think those are separate determinations, and they were both done appropriately under the correct standard. I'm happy to start with the preliminary injunction, because on the merits, that injunction can and should be affirmed on three independent bases. First, of course, there's bateness, where the district court correctly held that Mr. Khalil would not reasonably have been on notice that his lawful core political speech in the United States on a college campus would someday be determined by the Secretary of State to compromise a compelling United States foreign policy interest. That's not something that the text of the statute suggests, and as the district court correctly found, the enforcement history and the legislative history, all of these things point in the same direction, which is this is not a statute that had ever been used or interpreted to go after that type of speech. So on the bateness standard, I think it fails, and I think it fails particularly for the two sort of plus factors that exist on the bateness analysis, which is that this is a statutory provision that goes directly to speech and chills speech directly, as the district court found, when it is applied in a vague way as it was here, and also the penalties are very severe. Again, here he was detained, he was separated from his family, and removal proceedings were ultimately commenced on the basis of that determination. So on the bateness analysis, I think this is a very straightforward and easy case, and the district court's findings were correct there. I do think this is also a particularly appropriate case to affirm on the two alternative bases presented. There is a very straightforward First Amendment retaliation claim, and this is the sort of exceptional case where on every factor of the Mount Healthy analysis, they're simply not disputed. What American Arab Discrimination Committee is telegraphing is we're not supposed to get into those kinds of motivations. I mean, it's not the narrow holding, but the broader message of the case is courts don't go probe why the executive is doing what it's doing. I don't think that it could fairly be read as broadly, and I don't think courts since have interpreted it to do so. I think that was a determination that on those facts, a particular selective enforcement claim where someone was already, and the court's own language was unlawfully in the country and had conceded as much, could then not say, well, you're selectively enforcing this conceded violation for an additional reason that is impermissible. Here, we are getting at a preceding independent act by the Secretary of State from which serious harm flowed, and that is sort of very straightforward under the Mount Healthy retaliation analysis, which is a different one. And again, here, we have the government saying, yes, we did this specifically because of his lawful protected speech. This is the rare case where that direct evidence exists, and then there is simply no evidence that the district court made findings and the government hasn't contested that he was engaging in core political speech, that the adverse acts he took would certainly deter a person of ordinary firmness from engaging in that speech, and that the government did it for that reason. It's never attempted to then meet its burden when the test shifts. It's only argued, well, AADC says, you know, all noncitizens have no First Amendment rights. I think that runs squarely into the long history of the Supreme Court saying noncitizens do have First Amendment rights, particularly – this is Bridges versus Wixon. This is, you know, Quan Hai Chu versus Kolding. This is, in the 1990s, United States versus Orquidez. And AADC, I don't think, sub silentio sort of overruled the long history of the Supreme Court finding that particularly for lawful permanent residents who have a broad array of constitutional rights, suddenly they have no First Amendment rights at all in the context of – Let me just ask a quick question on that because I'm not sure I'm clear on the distinctions, but would you agree that citizens have more rights than LPRs? In certain contexts, but – LPRs have more rights than, you know, people that are here legally on a visa or something, but haven't yet gotten a green card. Yes. This court has noted that lawful permanent residents, I think, in your honors decision in Castro versus, you know, Department of Homeland Security, that lawful permanent residents are the quintessential example of people who have a broad array of constitutional rights. I would say that the Supreme Court in Quan Hai Chu said that, you know, once you are admitted lawfully and are a lawful permanent resident, then there is no distinction. The Constitution does not make a distinction between citizens and noncitizens. I think AADC did not tab in that. It said in a very – So you think LPRs have the same – the scope of rights for LPRs is identical to citizens? This court doesn't need to reach that, and I don't think that's necessarily true, but I do think in the context of this type of First Amendment claim, where you have an announced government policy to suppress a very specific viewpoint, it is absolutely consistent with the First Amendment to say that allowing, you know, the government to use the power of state to suppress that viewpoint as it concededly has done here – I guess I'm just trying to – – violates the First Amendment. I'm trying to figure out – you're here conditionally, right, even under – as an LPR, there are certain conditions, right? So why shouldn't the government have the power to remove people from a country that are harmful to the country? I'm speaking as a general, I'm not trying to the facts of this case necessarily. I think the answer is it has many means to do so, but it can't be based on lawful protected speech, particularly core political speech. And I think to find otherwise and to find that Mr. Khalil, you know, cannot make out a First Amendment claim – All right, but what about – what if – it's not core political speech. What if it's material support for terrorism? I think that is a different analysis and reasonably so. I think this is the exceptional case where it is about core political speech. And, you know, I think that is the quintessential case where the right is the strongest and the protections are the strongest, and also where the government has the lowest interest in, you know, imposing its power in a viewpoint discriminatory way. So when you balance those factors, I think everything weighs in favor of a First Amendment. All right, so let's assume for a minute that we agree with you that the June 11th injunction is valid. How can you support the July 17th order? It did a lot more than the June 11th order. Yeah, I think the straightforward answer – And just to be very blunt about it, it directly injected itself into ongoing removal proceedings in another part of the country, right? Well, I think the short answer is that, again, it was because the government had very clearly not obeyed its, you know, its original injunction. And so the court's power does expand when it is about equitably ensuring enforcement of a prior order. And so, you know, I think – The June 11th order wasn't – didn't address the fraud charge, though, right? The June 11th order did not address – no, it did not enjoin the fraud charge. And the IJ's opinion – it's a pretty long opinion, right? It was like, I think, 30 pages. The IJ's opinion covered both the Rubio determination and the fraud charge. The district court did not instruct the IJ to do anything about the fraud charge. Again, the district court, in a very targeted and narrow way, said, the one thing I told, you know, the government you cannot do is rely on this Rubio determination. It looked at how it had been used, and it said, you went ahead and did that. I'm instructing you – the government had broad discretion to figure out how to comply. And then what does the July 17th order say about the fraud charge? So the July 17th order does not enjoin the fraud charge. It says it can proceed as it normally would, and that all that it was instructing the government to do was to proceed as though the foreign policy ground, you know, was not a basis. So then you have no legal grounds to object to the immigration proceedings continuing apace under the fraud charge alone? I think that's a separate aspect of the petition that's not before this court, and that's not part of the injunction that's up on appeal. I think there are facts that are developing in the district court on an amended petition, but I think that presents a separate question that is, you know, different from what is a much more straightforward one here. So on retaliation, I do think it was appropriate for the district court – But I'm not sure you addressed my question, Billy. I guess you're just saying, full stop, there's nothing wrong with the scope of the July 17th order. I think what the – you know, read properly, what the district court did was try to effectuate its earlier order. It gave the government broad discretion to do that, and I don't think there was anything wrong with the scope of that. I think to the extent it needed to be narrowed or clarified, I think it should not erase the foundational principle, which is very straightforward and correct on the law, which is that the government is enjoined from using this Rubio determination from proceeding to detain Mr. Khalil, separate him from his family, and then ultimately use it as a basis for removal as it – I guess the idea here is that, you know, one of the respondents in the habeas case is the attorney general, and the attorney general – everyone who – I.J. is an instrument of the attorney general, right? So the district court can enjoin – I mean, I think the language was respondents are directed to cause the I.J. to do X, Y, and Z, right? So is it just your theory that because the attorney general is a respondent here, then the district court can essentially tell the I.J. what to do? I think that as a respondent, the attorney general was under an obligation to follow that order, and the order, yes, could flow to the I.J. and to the jurisdiction, you know, that the I.J. – or, sorry, the attorney general has. Why wouldn't it just – why wouldn't it suffice to say, as an ultimate matter, the attorney general and, you know, all respondents are enjoined from removing Mr. Khalil? But let the I.J. do whatever she's going to do, and – but at the end of the day, once there's a final order, if there's a final order of removal, that can't be acted upon. Why wouldn't that be good enough? I think that's what the district court originally tried to do with its first order, and then with its subsequent order, there were just very specific procedural harms that were flowing from having to proceed as though that interruption had not happened. And so the district court was trying in a targeted and a narrow way to address the procedural harms that were flowing from the I.J., continuing to say we are relying on the foreign policy ground, therefore we are not considering X, Y, and Z, and these other things aren't happening. I understand that those are distinct matters, but I think they certainly don't call into question the correctness of the original June 10th. Right, and I just want to circle back to where Judge Buda started with you, which was the distinction between the bail order and the P.I. If Mr. Khalil had the bail order first, would that have given him the complete relief that he wanted in an interim basis from the detention? Absolutely not, and the district court addressed why. I think it, you know, it certainly released him. I think the conditions of release on bail are very different from a preliminary injunction that would fully enjoin his detention. He remains on specific restrictive conditions of, you know, he's essentially in the custody of the United States legally while he remains on bail and has to follow several different conditions that restrict his ability to speak. So getting a preliminary injunction that enjoined his detention from which he would, you know, and if he was then released, that's just a very different type of relief. So the additional work that the P.I. is doing is not just about enjoining the removal, it is also aspects of the detention. Absolutely. I think it addressed directly the chill that flowed from him being in detention and it addressed the other irreparable harms the district court, you know, went through a comprehensive fact-finding process to identify regarding harms to his reputation and harms to his career that flowed from the determination itself, yes, as part of his detention, but also from other aspects of it. So it was addressing on the P.I. factors very correctly those irreparable harms that are well recognized by the Supreme Court and by the circuit. What did the district court say about likelihood of success on the merits about removal? The district court found that he was likely to succeed on his challenge to the use of the Rubio determination to remove him. This is because that was used, you know, in an as-applied analysis, it was likely to violate vagueness. So he did find that Mr. Cleel was likely to succeed on his challenge to the Rubio determination's use for his removal. It didn't go further. That doesn't help him on the fraud charge, though. No, the injunction on that issue did not address the fraud charge. That continues. So how can a district judge on a habeas petition enjoin an immigration judge from removing somebody when there might be myriad other grounds for removal besides the one ground that the district court addressed in its injunction? I think the district court didn't do that. He explicitly said, I'm only enjoining the use of this particular Rubio determination as a basis and authority for removal. So that was what was at issue in the preliminary injunction. That's what we moved for, and that's what was granted. I think it just is a separate fact, and the district court noted that. He said he is not enjoining, more broadly, removal on the alternative basis. That's another issue in the petition that's not up on appeal. And I guess I do want to point out, as my colleague mentioned, there is a third and independent challenge to detention that is based in due process. That is a very clean and separate challenge that alleges that the government did not have a constitutionally permissible purpose for detaining Mr. Khalil. It flows in one way directly from the punitive nature of that detention, but separately, as the district court found, he does not present a flight risk or a danger. The district court found that. The government, as the district court noted, had every opportunity to challenge that, and it did not do so. Under this court's precedent and under the Supreme Court's precedent, civil immigration detention cannot be used for a purpose that is punitive or for a purpose that is not constitutionally permissible. So flight risk or danger are those two purposes. So for all those reasons, the merits of the PI should certainly be affirmed. The district court was correct. And this is a uniquely appropriate situation to affirm on these alternative grounds that would very cleanly do away with Mr. Khalil's unconstitutional detention. Thank you, Mr. Hodgson. Thank you. We'll hear rebuttal. Mr. Ensign? I think the most powerful point made by your friend on the other side is that the IJ lacks the power to litigate constitutional claims. And you've mentioned the Hobbs Act, but 1252b4 seems to say that the review is going to be limited to the administrative record of which order removal is based. If we think this comes down to whether or not they'll have a chance to litigate these claims later, would the government agree that it's not going to raise a B4 bar and will allow the Court of Appeals to remand under the Hobbs Act for whatever factual finding is needed to litigate the due process, the void for vagueness, the First Amendment challenges down there? To a couple of response to that, Your Honor. There was intervening guidance provided by EOIR in September that made clear that IJs are able to hear constitutional claims generally. They've always been under an obligation to develop the record on that, not just having the ability to do so. They have an affirmative duty to develop that record. Do you have a citation to that guidance? Not offhand, Your Honor. I can provide that by 2012. Okay, great. The government represents to the court that it will allow the defendant, Mr. Khalil, sorry, to develop all the facts needed to pursue the due process and the void for vagueness, the First Amendment claims down there if we say that they're barred here. Yes, Your Honor. There is a limited exception that is not applicable here. I believe EOIR's guidance is that an IJ can't adjudicate a challenge to the IJ's constitutional authority to exercise power, much as, you know, for example, some various judges. But then that could be litigated once it got up to the Fifth Circuit? Yeah, absolutely, Your Honor. In fact, that's... And the government likewise makes a representation as to other aliens who are in the same position as Mr. Khalil? Yes, Your Honor. The IJ is empowered to develop the record, but if it does, if it is the case that the record is inadequately developed, the circuit court can then remand to a district court to further develop the record. We don't believe that's precluded by the IMA. When you address EOIR in your letter to the court, would you also address whether the Fifth Circuit has acknowledged that EOIR is correct and binding? Your Honor, I'm not aware of the Fifth Circuit weighing in on that, but we will certainly... Ultimately, these things would have to work together, right? If the facts have not been developed... I mean, he's out of the immigration judge's jurisdiction right now, right? There's been a notice of appeal to the BIA? There has been. He took 25 of the 30 days to file that, and so it's currently pending before the BIA... Okay. Well, regardless of how long it took him to file, I mean, no more facts will be developed before the IJ now. And as far as I know, facts have not been developed before the IJ. So it would be up to the Fifth Circuit to say that, based on this guidance that I'm not familiar with at this point, that there can be a remand to the agency for fact-finding before the IJ when none was done previously. Well, Your Honor, as to the foreign policy charge, that's been wiped from the IJ's decision. So the record could only... That charge could only ever be pursued upon a remand to the IJ. So as to the state of the record for the document... Sorry, as to the foreign policy charge, there is no such charge. So there would have to be new IJ proceedings before that could ever occur. And the record... Mr. Khalil's already had a full opportunity to develop the record there, but he wouldn't necessarily have another opportunity because, at present, the document fraud charge has been wiped clean, and that's one of the problems that we have with what the district court did is... What do you mean by that? You know, the document fraud charge has been wiped clean. Not the document fraud charge. I apologize, Your Honor. The foreign policy charge is no longer part of the IJ's order. That's part of the release, the district court order. That's part of the release that we think exceeds the allowable bound of habeas. Didn't the IJ reinstate her earlier order when she issued the order after the July 17th  I apologize, Your Honor. The IJ initially issued an order saying that Mr. Khalil is removable based on the fraud charge and the Secretary of State's termination, that issue. And then the district court said, you can't do that. And then subsequently, the order that is now on appeal to the BIA says, I'm reinstating my earlier order. That's what the IJ said, right? That's my rough understanding, Your Honor. But it did so at a time where there was an injunction against his removal. And so whatever the scope of habeas is, whether it's, you know, somewhat broader than attention rod, it has never been understood to allow direct appellate review of an IJ. Habeas is not an opportunity to blue pencil IJ decisions. And that is how the district court exercised its habeas jurisdiction here. And that's directly relevant for what's coming, because as opposing counsel alluded to, they've amended their petition and they're going to try to have the district court similarly try to, you know, blue pencil out the document fraud charge. I guess I'm just trying to nail down what you mean by something being wiped clean, because my understanding is that the current order that is on appeal to the BIA incorporates the earlier order that included discussion of all these issues that the district court didn't want the IJ to include. Your Honor, that's not my understanding. My understanding is the order that's on appeal to the BIA is one finding him removable under the document fraud charge. And that is the only ground he's been found removable on that's pending before the BIA. If I may, I did want to make... What's the citation for that? What's that? How do we know that? Your Honor, I think that's, I think it's the revised IJ order. That's certainly our understanding. If that's incorrect, we will, you know, point that out to the court, but that's our understanding of the IJ's, you know, amended order as a result of the July, the order of the district court is that all that's contained is the document fraud charge and not the foreign policy charge. All right. Well, when you submit the guidance, submit a copy of that as well, please. Any other questions? Okay. All right. Thank you. Did you have any concluding remarks, Mr. Ensign? I wanted to make three quick points if I can, just very quickly. But one is that opposing counsel suggested that Jennings categorically carved out custody from B9. That's simply not what it said. Indeed, Jennings went out of its way to say the decision to detain the alien in the first place is actually something that is within the B9 bar. Second, I didn't hear any real explanation of how a challenge to removal falls within the now or never principle of EEOHC. And thus, I think at a bare minimum, that is something that's subject to the jurisdictional bars. And I think opposing counsel admitted that what they're doing here is precisely what Congress attempted to avoid. They're admitting to fragmenting their proceedings. They're admitting that they're potentially trying to use those proceedings to seek preclusive effect to circumvent the carefully designed and articulated scheme that Congress has created for judicial review that goes straight to court of appeals. And it gets even stranger than that because at least at times, too, they've admitted that once there is a final order of removal, the district court here would lose jurisdiction. So you wouldn't just have fragmented proceedings that might lead to preclusion. You could have the whiplash of all of a sudden the district court would lose jurisdiction. So that is not the sensible and very articulated scheme that Congress created with 1252. And we think that these admissions make all the more clear that what petitioner is doing here is precisely what Congress sought to avoid in enacting 1252 bars. All right. Thank you to counsel for both sides. I will order a transcript to be provided to the court at the government's expense. The court will take the matter under advisement.